1  ALDRICH LAW FIRM, LTD.
   JOHN P. ALDRICH (NV Bar No. 6877)
2  1601 S. Rainbow Blvd., Suite 160
   Las Vegas, Nevada 89146
3  Telephone: (702) 853-5490
   Facsimile: (702) 227-1975
4  jaldrich@johnaldrichlawfirm.com

5  THE WEISER LAW FIRM, P.C.
   ROBERT B. WEISER
6  BRETT D. STECKER
   JEFFREY J. CIARLANTO
7  22 Cassatt Avenue, First Floor
   Berwyn, PA 19312
8  Telephone: (610) 225-2677
   Facsimile:  (610) 408-8062
9  rw@weiserlawfirm.com
   bds@weiserlawfirm.com
10 jjc@weiserlawfirm.com

11 [Additional counsel listed on signature page.]

12                 **UNITED STATES DISTRICT COURT**
                   **DISTRICT OF NEVADA**

13 ─────────────────────────────

14 SUI YIP, derivatively on behalf of          :: Civil Action No.
   GALECTIN THERAPEUTICS, INC.,                ::

15                              Plaintiff,      ::
                                               :: VERIFIED SHAREHOLDER DERIVATIVE
16 v.                                          :: COMPLAINT FOR BREACH OF
                                               :: FIDUCIARY DUTY, GROSS
17 PETER G. TRABER, JACK W.                    :: MISMANAGEMENT, ABUSE OF
   CALLICUTT, JAMES C. CZIRR, ROD D.           :: CONTROL, UNJUST ENRICHMENT, AND
18 MARTIN, GILBERT F. AMELIO,                  :: VIOLATIONS OF SECTION 14(A) OF THE
   STEVEN PRELACK, KEVIN D.                    :: SECURITIES EXCHANGE ACT OF 1934
19 FREEMAN, ARTHUR R. GREENBERG,               ::
   JOHN F. MAULDIN,  PAUL PRESSLER             ::
20 and MARC RUBIN,                             ::

21                              Defendants,     :: **JURY TRIAL DEMANDED**
                                               :: JURY TRIAL DEMANDED
22 and                                         ::

23 GALECTIN THERAPEUTICS, INC.,                ::

24                      Nominal Defendant.      ::

25 ─────────────────────────────

26

27

28 ─────────────────────────────
   VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTY, GROSS
   MISMANAGEMENT, ABUSE OF CONTROL, UNJUST ENRICHMENT, AND VIOLATIONS OF SECTION 14(A)
   OF THE SECURITIES EXCHANGE ACT OF 1934

## VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1.     Plaintiff Sui Yip ("Plaintiff"), by and through his undersigned attorneys, hereby submits this Verified Shareholder Derivative Complaint (the "Complaint") for the benefit of nominal defendant Galectin Therapeutics Inc. ("Galectin" or the "Company") against certain members of its Board of Directors (the "Board") and executive officers seeking to remedy defendants' breaches of fiduciary duties and unjust enrichment from 2013 to the present (the "Relevant Period").

### NATURE OF THE ACTION

2.     According to its public filings, Galectin is a development stage company engaged in the research and development of therapies for fibrotic disease and cancer.  The Company's lead product candidates include GR-MD-02, a complex polysaccharide polymer for the treatment of liver fibrosis and fatty liver disease (nonalcoholic steatohepatitis or "NASH").  According to its public filings, "the Company is developing promising carbohydrate-based therapies for the treatment of fibrotic liver disease and cancer based on the Company's unique understanding of galectin proteins, key mediators of biologic function. We are leveraging extensive scientific and development expertise as well as established relationships with external sources to achieve cost effective and efficient development. We are pursuing a clear development pathway to clinical enhancement and commercialization for our lead compounds in liver fibrosis and cancer."

3.     In June 2013, the defendants secretly and illicitly retained Emerging Growth Corp. (also known as Emerging Growth LLC) ("Emerging Growth"), through its parent company TDM Financial ("TDM")—a penny stock promotion firm—to begin a series of misleading promotional campaigns to entice investors to buy Galectin stock.  Most of these "articles" were published via special press releases issued by Emerging Growth.  Notably, Emerging Growth did not promote the

- 1 -

Company's products to potential customers, or even possible partners.  Rather, its sole focus was promoting the Company's stock on various investment mediums.

4.      Thereafter, the Company's stock price increased.  Meanwhile, the defendants issued false and misleading statements regarding the phase I study of one of the Company's experimental drugs.  Further, during this time, certain of the defendants (including directors of Galectin) sold or caused to be sold shares of Galectin stock at artificially inflated prices.

5.      Defendants' charade continued until July 28, 2014, when *TheStreet.com* senior columnist Adam Feuerstein ("Feuerstein") published an article detailing the scheme.  On this news, Galectin shares fell $8.84 per share, or nearly *61%*, to close on July 29, 2014 at $5.70 per share.

6.      Throughout the Relevant Period, the defendants caused the Company to enter into and perpetrate a scheme with Emerging Growth/TDM whereby these promoters would disseminate positive but misleading reports about the Company.  Defendants never disclosed this scheme to shareholders, nor did they ever seek approval for such a scheme.  Moreover, the defendants failed to disclose that GR-MD-02 did not provide the benefits suggested by the defendants when discussing the patent the Company was awarded or the Phase 1 clinical trial the defendants were causing the Company to conduct.

7.      Accordingly, as a result of defendants' breaches, the Company has been damaged.

## JURISDICTION AND VENUE

8.      This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 in that this Complaint states a federal question.  This Court has supplemental jurisdiction over the state law claims asserted herein pursuant to 28 U.S.C. §1367(a).  This action is not a collusive one to confer jurisdiction on a court of the United States which it would not otherwise have.

9.      Venue is proper in this district because a substantial portion of the transactions and

- 2 -

wrongs complained of herein, including the defendants' primary participation in the wrongful acts detailed herein, occurred in this district.  Galectin is incorporated in this District.

## THE PARTIES

10.     Plaintiff is a current shareholder of Galectin and has continuously held Galectin stock since February 2007.

11.     Nominal defendant Galectin is a Nevada corporation, with its principal executive offices at 4960 Peachtree Industrial Boulevard, Suite 240, Norcross, Georgia 30071.

12.     Defendant Peter G. Traber ("Traber") has served as the Company's President and Chief Executive Officer ("CEO") since March 2011, and as a director since 2009.  In addition, Traber serves as the Company's Chief Medical Officer.

13.     Defendant Jack W. Callicutt ("Callicutt") has served as the Company's Chief Financial Officer ("CFO") since July 1, 2013.

14.     Defendant James C. Czirr ("Czirr"), a founder of the Company, has served as Executive Chairman of the Board since February 2010 and as Chairman of the Board since February 2009.  In addition, Czirr is a co-founder and Managing Member of 10X Fund, L.P. (the "10X Fund")[1] and is a managing member of 10X Capital Management LLC ("10X Capital Management"), the general partner of 10X Fund.

15.     Defendant Rod D. Martin ("Martin") has served as Vice Chairman of the Board

---

[1] Upon information and belief, during the Relevant Period the 10X Fund was one of the largest shareholders of Galectin. As of March 19, 2014, the 10X Fund was the owner of all of the issued and outstanding shares of Galectin Series B preferred stock. As holders of Galectin Series B preferred stock, 10X Fund has the right to, among other things, vote as a separate class to nominate and elect two directors, referred to as the Series B directors, and to nominate three directors, referred to as the Series B nominees, who must be recommended for election by holders of all of Galectin's securities entitled to vote on election of directors.

- 3 -

since February 2010 and as a director since February 2009.  In addition, Martin is a co-founder and Managing Member of 10X Capital Management.

16.    Defendant Gilbert F. Amelio ("Amelio") has served as a director of the Company since February 2009.

17.    Defendant Steven Prelack  ("Prelack") has served as a director of the Company since April 2003.  In addition, defendant Prelack served as Chair of the Company's Audit Committee (the "Audit Committee") during the Relevant Period.

18.    Defendant Kevin D. Freeman ("Freeman") has served as a director of the Company since May 2011.  In addition, defendant Freeman served as a member of the Audit Committee during the Relevant Period.

19.    Defendant Arthur R. Greenberg ("Greenberg") has served as a director of the Company since August 2009.  In addition, defendant Greenberg served as a member of the Audit Committee during the Relevant Period.

20.    Defendant John F. Mauldin ("Mauldin") has served as a director of the Company since May 2011.

21.    Defendant Paul Pressler ("Pressler") has served as a director of the Company since May 2011.

22.    Defendant Marc Rubin ("Rubin") has served as a director of the Company since October 2011.

23.    Collectively, defendants Traber, Callicutt, Czirr, Martin, Amelio, Prelack, Freeman, Greenberg, Mauldin, Pressler and Rubin shall be referred to herein as "Defendants."

24.    Collectively, defendants Prelack, Freeman and Greenberg shall be referred to as the "Audit Committee Defendants."

- 4 -

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTY, GROSS MISMANAGEMENT, ABUSE OF CONTROL, UNJUST ENRICHMENT, AND VIOLATIONS OF SECTION 14(A) OF THE SECURITIES EXCHANGE ACT OF 1934

25.     Collectively, defendants Prelack, Martin and Czirr shall be referred to as the "Insider Selling Defendants."

### DEFENDANTS' DUTIES

26.     By reason of their positions as officers, directors, and/or fiduciaries of Galectin and because of their ability to control the business and corporate affairs of Galectin, Defendants owed Galectin and its shareholders fiduciary obligations of good faith, loyalty, and candor, and were and are required to use their utmost ability to control and manage Galectin in a fair, just, honest, and equitable manner.  Defendants were and are required to act in furtherance of the best interests of Galectin and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit.  Each director and officer of the Company owes to Galectin and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

27.     Defendants, because of their positions of control and authority as directors and/or officers of Galectin, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.  Because of their advisory, executive, managerial, and directorial positions with Galectin, each of the Defendants had knowledge of material non-public information regarding the Company.

28.     To discharge their duties, the officers and directors of Galectin were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the Company.  By virtue of such duties, the officers and directors of Galectin were required to, among other things:

29.     Exercise good faith to ensure that the affairs of the Company were conducted in an

- 5 -

efficient, business-like manner so as to make it possible to provide the highest quality performance of their business;

30.    Exercise good faith to ensure that the Company was operated in a diligent, honest and prudent manner and complied with all applicable federal and state laws, rules, regulations and requirements, and all contractual obligations, including acting only within the scope of its legal authority; and

31.    When put on notice of problems with the Company's business practices and operations, exercise good faith in taking appropriate action to correct the misconduct and prevent its recurrence.

32.    Every officer, director and employee of Galectin (and thus each of the Defendants) was required to comply with the Company's Code of Conduct and Ethics (the "Code").  Among other things, the Code sets forth the following:

33.    Employees, officers and directors who have access to confidential information are not permitted to use or share that information for stock trading purposes or for any other purpose except the conduct of our business, whether or not such information is viewed as material. All non-public information about the Company should be considered confidential information. To use non-public information for personal financial benefit or to "tip" others who might make an investment decision on the basis of this information is not only unethical but also illegal.

34.    Pursuant to the Audit Committee's Charter, the members of the Audit Committee are charged with, among other things, the quality and integrity of the Company's financial statements and internal controls, and the Company's compliance with legal and regulatory requirements.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTY, GROSS MISMANAGEMENT, ABUSE OF CONTROL, UNJUST ENRICHMENT, AND VIOLATIONS OF SECTION 14(A) OF THE SECURITIES EXCHANGE ACT OF 1934

## SUBSTANTIVE ALLEGATIONS

### A.      Company Background

35.      According to its public filings, Galectin is a development stage company engaged in the research and development of therapies for fibrotic disease and cancer.  The Company's lead product candidates include GR-MD-02, a complex polysaccharide polymer for the treatment of liver fibrosis and fatty liver disease (nonalcoholic steatohepatitis or "NASH").  According to its public filings, the Company is developing promising carbohydrate-based therapies for the treatment of fibrotic liver disease and cancer based on the Company's unique understanding of galectin proteins, key mediators of biologic function. We are leveraging extensive scientific and development expertise as well as established relationships with external sources to achieve cost effective and efficient development.  We are pursuing a clear development pathway to clinical enhancement and commercialization for our lead compounds in liver fibrosis and cancer.

### B.      Defendants' Illicit Scheme

36.      In June 2013, Defendants secretly and illicitly retained Emerging Growth, through its parent company TDM—a penny stock promotion firm—to begin a series of misleading promotional campaigns to entice investors to buy Galectin stock.  Notably, Emerging Growth did not promote the Company's products to potential customers, or even possible partners.  Rather, its sole focus was promoting the Company stock on various investment mediums.  At the time, Galectin stock was trading for approximately $4.00 per share.

37.      By way of example only, one such "article" was published on August 14, 2013, and entitled "Galectin Therapeutics Receives Fast Track Designation from FDA for New Fibrosis

- 7 -

Drug."[2]  The "article" set forth, in relevant part:

> Shares of Galectin Therapeutics (NASDAQ: GALT) hit their highest level since June 2011 in the last two trading sessions after announcing that the U.S. Food and Drug Administration granted the company a Fast Track designation for GR-MD-02 as a potential new drug for non-alcoholic steatohepatitis, or "NASH" as its often called. Shares of Galectin have been steadily rising in 2013, advancing about 240 percent, upon pipeline developments as the drugmaker emerges as a leader in fibrosis and cancer therapies.
>
> With no FDA-approved drugs available for fibrosis, the upside potential is large, to say the least, with only limited companies, including Vertex Pharmaceuticals Inc. (NASDAQ: VRTX) and InterMune Pharmaceuticals Inc. (NASDAQ: ITMN) looking to blaze new trails in fibrosis along with Galectin. It is estimated that NASH affects as many as 15 million people in the United States, generally carrying a very grim prognosis in advanced stages. The Fast Track designation is designed to expedite the review process in new drugs that could potential provide a therapeutic option for serious or life-threatening conditions that represent an area of unmet medical need. As part of the Fast Track plan, the biotech is able to submit data to FDA as it is compiled and opens the door to more meetings with regulators.
>
> Late in July, Galectin disclosed that the first patients were dosed with GR-MD-02 in a Phase I clinical trial evaluating the effect of the new drug in patients with fatty liver disease with advanced fibrosis. A maximum of 40 patients will be treated across six U.S. centers in the trial.

38.    By October 1, 2013, Defendants' scheme had begun to bear fruit, with Galectin stock trading at over $10.00 per share.  As such, the Insider Selling Defendants could begin to cash in on the scheme, either personally or by way of entities they controlled.  On or about October 7, 2013, while in possession of material, adverse, non-public information, defendants Czirr and Martin caused the 10X Fund to sell 100,000 shares of its Galectin stock at $11.79 per share, reaping proceeds of $1.179 million.  The following day, while in possession of material, adverse, non-public information, defendants Czirr and Martin caused the 10X Fund to sell an additional 12,000 shares of its Galectin stock at $12.36 per share, reaping proceeds of $148,320 (for a two day total of

---

[2]  Article available at: http://www.barchart.com/headlines/story/11643044/galectin-therapeutics-receives-fast-track-designation-from-fda-for-new-fibrosis-drug

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTY, GROSS MISMANAGEMENT, ABUSE OF CONTROL, UNJUST ENRICHMENT, AND VIOLATIONS OF SECTION 14(A) OF THE SECURITIES EXCHANGE ACT OF 1934

$1,327,320).

39.   Emerging Growth continued to publish "articles" about Galectin in the months that followed.

40.   On January 6, 2014, Defendants issued a press release entitled "Galectin Therapeutics Receives US Patent for Combination Treatment for Liver Fibrosis." The press release set forth, in relevant part:

> Galectin Therapeutics (Nasdaq:GALT), the leading developer of therapeutics that target galectin proteins to treat fibrosis and cancer, today announced that it has received a notice of allowance from the U.S. Patent and Trademark Office for patent application number 13/550,962 titled "Galactose-Pronged Polysaccharides in a Formulation for Anti-fibrotic Therapies." The patent covers both composition claim for and uses of the Company's carbohydrate-based galectin inhibitor compound GR-MD-02 for use in patients with liver fibrosis in combination with other potential therapeutic agents. The patent covers use of GR-MD-02 with agents directed at multiple targets, some of which are currently in clinical development for fibrotic disorders including monoclonal antibodies to connective tissue growth factor, integrins, and TGF-$\beta$1.

> "This patent provides additional coverage in the U.S. for the use of GR-MD-02 in combination with other potential anti-fibrotic agents in the treatment of liver fibrosis," said Peter G. Traber, MD, President, CEO and CMO of Galectin Therapeutics. "In the future, liver fibrosis could be treated with a combination of agents, and this patent provides important intellectual property for this possibility. We are hopeful that our development program for GR-MD-02 will lead to the first therapy for the large unmet medical need of liver fibrosis."

> Galectin Therapeutics is currently conducting a Phase 1 clinical trial to evaluate the safety, tolerability and exploratory biomarkers for efficacy for single and multiple doses of GR-MD-02 over four weekly doses of GR-MD-02 treatment in patients with fatty liver disease with advanced fibrosis. In March 2013, the U.S. Food and Drug Administration (FDA) granted GR-MD-02 Fast Track designation for non-alcoholic steatohepatitis (NASH) with hepatic fibrosis, commonly known as fatty liver disease with advanced fibrosis.

41.   In the three days following the issuance of this Company press release, Galectin's stock price increased from $8.36 per share to $15.10 per share. Once again, the Insider Selling Defendants cashed in. On or about January 10, 2014, while in possession of material, adverse, non-

- 9 -

public information, defendants Czirr and Martin caused the 10X Fund to sell 42,000 shares of its Galectin stock at $16.00 per share, reaping proceeds of $672,000.  Then, on or about January 13, 2014, while in possession of material, adverse, non-public information, defendants Czirr and Martin caused the 10X Fund to sell an additional 58,000 shares of its Galectin stock for $14.00 per share, reaping proceeds of $812,000.

42.    On January 31, 2014, while in possession of material, adverse, non-public information, defendant Prelack took advantage of the artificially inflated price of Galectin stock by disposing of 17,772 shares of Galectin stock at $13.71 per share, which produced a benefit of $242,968.[3]

43.    On March 21, 2014, Defendants caused the Company to file with the United States Securities and Exchange Commission ("SEC") an annual report on Form 10-K (the "2013 10-K"), which was signed by Defendants.  The 2013 10-K failed to disclose the existence of the relationship, agreement, and scheme that the Defendants entered into with Emerging Growth and TDM.

44.    Moreover, the 2013 10-K misstated the purported effectiveness of GR-MD-02 with respect to nonalcoholic steatohepatitis (NASH).   On that subject, the 2013 10-K set forth, in relevant part:

> *Fibrosis.* GR-MD-02 is our lead product candidate for treatment of fibrotic disease. Our preclinical data show that GR-MD-02 has a powerful therapeutic effect on liver fibrosis as shown in several relevant animal models. Therefore, we chose GR-MD-02 as the lead candidate in a development program targeted initially at fibrotic liver disease associated with non-alcoholic steatohepatitis (NASH, or fatty liver disease).

---

[3] According to the Form 4 filed with the SEC on February 4, 2014, this transaction represented shares forfeited in satisfaction of the exercise price of the vested options.  Had Galectin stock not been trading at artificially inflated prices (due to Defendants' scheme), defendant Prelack would have been required to forfeit far more than 17,772 shares of Company stock.

- 10 -

In January 2013, an Investigational New Drug ("IND") was submitted to the FDA with the goal of initiating a Phase 1 study in patients with NASH and advanced liver fibrosis to evaluate the human safety of GR-MD-02 and pharmacodynamics biomarkers of disease. On March 1, 2013, the FDA indicated we could proceed with a US Phase 1 clinical trial for GR-MD-02 with a development program aimed at obtaining support for a proposed indication of GR-MD-02 for treatment of NASH with advanced fibrosis. Pre-clinical studies also show promise for the combination of GR-MD-02 with other approved immunotherapies and this additional use has been advanced into clinical trials under an Investigator-sponsored IND in the United States.

Our drug candidate provides a promising new approach for the therapy of fibrotic diseases, and liver fibrosis in particular. Fibrosis is the formation of excess connective tissue (collagen and other proteins plus cellular elements such as myofibroblasts) in response to damage, inflammation or repair. When the fibrotic tissue becomes confluent, it obliterates the cellular architecture, leading to scarring and dysfunction of the underlying organ.

45.     In addition, pursuant to the Sarbanes-Oxley Act of 2002, the 2013 10-K contained signed certifications ("SOX Certifications") by defendants Traber and Callicutt, stating that the financial information contained in the Form 10-K was accurate, and that any material changes to the Company's internal control over financial reporting were disclosed.   The SOX Certifications set forth:

I, [Peter G. Traber/Jack W. Callicutt], certify that:

1. I have reviewed this annual report on Form 10-K of Galectin Therapeutics Inc.;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) for the registrant and we have:

- 11 -

a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

\*     \*     \*

In connection with the Annual Report of Galectin Therapeutics Inc. (the "Company") on Form 10-K for the period ended December 31, 2013 as filed with the Securities and Exchange Commission on the date hereof (the "Report"), I, [Peter G. Traber, Chief Executive Officer and President of the Company/ Jack W. Callicutt, Chief Financial Officer of the Company], certify, pursuant to 18 U.S.C. §1350, as adopted pursuant to §906 of the Sarbanes-Oxley Act of 2002, that, to my knowledge:

(1) The Report fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934; and

- 12 -

(2) The information contained in the Report fairly presents, in all material respects, the financial condition and result of operations of the Company.

46.     Also on March 21, 2014, Defendants caused the Company to file with the SEC a Proxy Statement on Form DEF 14A (the "2014 Proxy"). In the 2014 Proxy, Defendants utterly failed to disclose that they had caused the Company to enter into a scheme with Emerging Growth/TDM, whereby these promoters would disseminate positive but misleading reports about the Company. As such, the Defendants caused the 2014 Proxy to be false and misleading at the time it was issued.

47.     On March 25, 2014, Defendants issued a press release entitled "Galectin Therapeutics to Announce Results From First Cohort of Phase 1 Clinical Trial in Fatty Liver Disease." The press release set forth, in relevant part:

> Galectin Therapeutics (Nasdaq:GALT), the leading developer of therapeutics that target galectin proteins to treat fibrosis and cancer, announced that on Monday, March 31, 2014, the Company will report results from the first cohort of its Phase 1 clinical trial examining GR-MD-02 in fatty liver disease (NASH) with advanced fibrosis. The first-in-man study, which enrolled eight patients in the first cohort, is evaluating the safety, tolerability, and exploratory biomarkers for efficacy for single and multiple doses of galectin inhibiting drug GR-MD-02 when administered to patients with fatty liver disease with advanced fibrosis.
>
> Peter G. Traber, M.D., Chief Executive Officer, President and Chief Medical Officer of Galectin Therapeutics, will lead a webcast and conference call on April 1, 2014 at 8:30 a.m. Eastern Daylight Time to review the findings. As time permits, a question and answer session will immediately follow Dr. Traber's presentation.
>
> *     *     *
>
> The Phase 1 multi-center, partially-blinded clinical trial is being conducted in a total of 24 patients who receive four weekly doses of GR-MD-02. Each of the three cohorts consists of eight patients, six randomized to receive active drug and two randomized to receive placebo. Eight U.S. clinical sites with extensive experience in clinical trials in liver disease are now active to ensure rapid enrollment of the second cohort. Trial design details can be found at http://clinicaltrials.gov/ct2/show/NCT01899859?term=gt-020&rank=1.

- 13 -

GR-MD-02 is a complex carbohydrate drug that targets galectin-3, a critical protein in the pathogenesis of fatty liver disease and fibrosis. Galectin proteins play a major role in diseases that involve scaring of organs such as cancer, and inflammatory and fibrotic disorders. The drug binds to galectin proteins and disrupts their function. Preclinical data has shown that GR-MD-02 has robust treatment effects in reversing fibrosis and cirrhosis.

48.     On March 31, 2014, Defendants issued a press release entitled "First Cohort Results in Galectin Therapeutics' Phase 1 Trial Reveal Biomarker Evidence of Therapeutic Effect on Fibrosis and Inflammation in NASH With Advanced Fibrosis."   The press release set forth, in relevant part:

Galectin Therapeutics (Nasdaq:GALT), the leading developer of therapeutics that target galectin proteins to treat fibrosis and cancer, today announced that results from the first cohort of its Phase 1 trial show that GR-MD-02 had an effect on biomarkers that suggest a therapeutic effect on fibrosis, inflammation, and cellular injury. The first-in-man study, which enrolled eight patients in the first cohort, is evaluating the safety, tolerability, and exploratory biomarkers for efficacy for single and multiple doses of its galectin-inhibiting drug GR-MD-02 when administered to patients with fatty liver disease (NASH) with advanced fibrosis.

First cohort results indicate that GR-MD-02 was safe and well tolerated following four doses of 2 mg/kg (80 mg/m$^2$) and there were no serious adverse events. The pharmacokinetics were consistent between individuals and after single and multiple doses with no drug accumulation after multiple doses. In assessing secondary endpoints, it was found that multiple biomarkers of fibrosis and inflammation showed improvement after four doses of GR-MD-02. Additionally, patients with greater evidence of liver cell injury, as indicated by elevated transaminase enzyme levels, had a marked decrease in CK-18, a clinically validated biomarker of cell death. Galectin-3 blood levels, which do not correlate with tissue levels in NASH, were not changed with treatment.

*       *       *

"We are extremely pleased with the positive results of the first cohort of our Phase 1 trial, which suggest a role for GR-MD-02 in the treatment of patients with fatty liver disease with advanced fibrosis," said Peter G. Traber, M.D., Chief Executive Officer, President and Chief Medical Officer of Galectin Therapeutics. "Fatty liver disease, characterized by the presence of fat in the liver along with inflammation, over time can develop into fibrosis, or scarring of the liver, which is estimated to affect millions of Americans. Intervention with the intent of reversing the fibrosis is a potentially important therapeutic approach in fatty liver disease, a condition with significant unmet medical need."

49.     On April 11, 2014, while in possession of material, adverse, non-public information, defendant Prelack sold 6,000 shares of his personally held Galectin stock for $11.84 per share, reaping proceeds of $71,010.

50.     On April 23, 2014, Defendants issued a press release entitled "Galectin Therapeutics Completes Enrollment of Second Cohort of Phase 1 Trial of GR-MD-02 for NASH (Fatty Liver Disease) With Advanced Fibrosis." The press release set forth, in relevant part:

> "We are pleased that enrollment of the second cohort was completed very rapidly, which speaks to the urgent need to identify an effective treatment for fatty liver disease with advanced fibrosis," said Dr. Peter G. Traber, President, Chief Executive Officer, and Chief Medical Officer of Galectin Therapeutics Inc. "The goal of therapy with GR-MD-02 in NASH patients with advanced fibrosis is the reversal of fibrosis and prevention of complications of cirrhosis and liver transplantation."

51.     On May 13, 2014, Defendants issued a press release entitled "Galectin Therapeutics Reports First Quarter 2014 Financial Results." In addition to reporting a quarterly net loss of $5.4 million, or ($0.27) diluted earnings per share, the press release set forth, in relevant part:

> "We continued to make significant progress in our liver fibrosis development program through the first quarter of 2014. We announced the successful results of the first cohort of patients in our Phase 1 clinical trial for patients with NASH with advanced fibrosis, which demonstrated that GR-MD-02 was safe and well tolerated. Additionally, the results demonstrated positive changes in biomarkers, suggesting a therapeutic effect on fibrosis.  More recently, we announced on April 23, 2014, that we have completed the enrollment of all of the required patients in cohort 2 of this Phase 1 clinical trial, and we expect to announce the results around the end of July 2014," said Peter G. Traber, M.D., Chief Executive Officer, President and Chief Medical Officer, Galectin Therapeutics. "This Phase 1 first-in-man study is evaluating the safety, tolerability, pharmacokinetics and exploratory biomarkers for efficacy for single and multiple doses of GR-MD-02 when administered to patients with fatty liver disease with advanced fibrosis."

52.     On July 24, 2014, Emerging Growth disseminated a press release through

- 15 -

1   *Accesswire* entitled "Galectin, Intercept, Others Vying for Lead Drugs in NASH Epidemic."[4]  This

2   press release set forth, in relevant part:

> Fat is driving the bus these days in one narrow, but widening, biotech sector as companies strive for dominance. Among these are Galectin Therapeutics Inc. (GALT), Intercept Pharmaceuticals (ICPT), Raptor Pharmaceuticals (RPTP) and Gilead Sciences (GILD), all of which are in search of a cure for one stage or another of "fatty liver disease."

> Fatty liver disease, at its extreme, means certain death. The prize these companies are seeking is not only to cheat death but also to claw back some of the astronomical healthcare costs related to the condition. Taking into account the varying stages of fatty liver disease, the U.S. market is projected to be valued at up to $40 billion by 2025. There's always the liver transplant option, right? Wrong. One estimate, from TransplantLiving.org, places the cost of a liver transplant at nearly $600,000 and that estimate does not even cover all the other healthcare costs on the long road to referral for a transplant. For the half a million people in the U.S. that have liver cirrhosis or the up to 15 million people suffering from fatty liver disease, the hope for a transplant is not good either, considering only about 6,300 liver transplants are conducted annually.

> Worse yet, diagnostics outside of a biopsy are lacking and there are no FDA approved therapies for the treatment of liver fibrosis, which explains the value Wall Street is placing on this relatively unattended segment of biotech.

> Medical terms for these related diseases and their stages vary. NAFLD is a catch-all term meaning nonalcoholic fatty liver disease (estimated to affect about 30% of the North American population); NASH refers to nonalcoholic steatohepatitis, a condition which, according to a statement at Science.gov, "can progress to cirrhosis in 15-20%" of patients. The statement goes on to show that NAFLD "may predispose patients to hepatocellular carcinoma," i.e., liver cancer. The U.S. National Institutes of Health notes that "NASH occurs in people who drink little or no alcohol and affects 2 to 5 percent of Americans, especially people who are middle-aged and overweight or obese," and that the condition also occurs in children.

> From a clinical stage perspective, Intercept is leading the race, having delivered positive data from a Phase 2 trial of obeticholic acid (OCA) earlier this year. Shares tripled on the news. Galectin, a newly-coined member of the Russell 2000, is nipping at Intercept's heels and actually may be closer than what first appears with a Phase 1 trial because of the potential to treat fatty liver disease even once it has progressed. What distinguishes their approach from others that the timing of intervention with

---

[4] Available at: http://finance.yahoo.com/news/galectin-intercept-others-vying-lead-140000916.html

their proprietary carbohydrate polymer drug GR-MD-02 may be largely irrelevant to outcomes, with GR-MD-02 seeming to work well even in advanced stages of liver fibrosis. This is especially important in fatty liver diseases because they are silent killers, often going undiagnosed for many years. The Galectin drug was granted FDA fast-track approval nearly a year ago.

Galectin has announced GR-MD-02 to be safe and well tolerated in the first cohort of patients in its clinical trial, as well as showing changes in key biomarkers, which suggests a therapeutic effect on fibrosis, or scarring of the liver that leads to loss of liver function. Enrollment has been completed in the second cohort, with results expected in the next few weeks, potentially a catalytic moment for the company's value.

Further, late in June Galectin disclosed that research in an animal model of NASH showed an oral version of GR-MD-02 to demonstrate a significant improvement in disease. Coming at NASH with both infused and oral formulations could give Galectin a competitive edge going forward.

Raptor has been narrowly focused on NASH treatment of adolescents with a slow-release form of cysteamine bitartrate, which it developed after obtaining rights to the core drug from University of California at San Diego. Raptor is conducting a Phase 2b trial under a Cooperative Research and Development Agreement with the National Institute of Diabetes and Digestive and Kidney Diseases, part of the National Institutes of Health.

Gilead is acting across a broader age spectrum in NASH treatment and should be completing enrollment soon for a Phase 2b testing of its drug simtuzumab (GS-6624). Results might be announced late 2016 or so. Gilead is looking to grow its footprint in the liver disease space that is being overrun by NASH diagnoses. The growing number of effective treatments for hepatitis C, including Gilead's Sovaldi, are lending to a stabilized number in liver transplants related to hep C, with predictions that NASH will surpass hep C as the leading cause of liver transplants by 2020.

The apparently sudden prevalence of fatty liver disease and NASH on the biotech horizon is due to the increasing incidence of obesity worldwide and greater awareness of the conditions. After all, NASH didn't even have a medical name three decades ago. A U.S. Centers for Disease Control report says that 34.9% of American adults are obese. That's a 50% increase in obesity in less than 40 years and has lent impetus to the rise in NASH, a disease dubbed "the next big global epidemic" on CNBC's NBR.

Those are big numbers and potentially big profits. So it is clear that fat is indeed driving the biotech bus, with Galectin, Intercept, Gilead and Raptor in the front seats and vying to take control of the wheel.

- 17 -

53.     Shortly after the issuance of this press release, Defendants issued a Company press release announcing a conference call on July 25, 2014 to a provide updated results from the Phase 1 NASH study.

54.     Following these releases, Galectin's stock price increased from $13.72 per share to $15.32 per share.

**C.     The Truth Begins To Emerge**

55.     On July 25, 2014, Feuerstein tweeted "$GALT paying penny stock promoters to issue misleading PRs posted to Y!"

56.     On July 28, 2014, Bleecker Street Research published an article on *SeekingAlpha.com* claiming that Galectin "'has strong ties to stock promoters' engaging in a misleading brand awareness campaign aimed at boosting its stock price."

57.     Also on July 28, 2014, Feuerstein published an article on *TheStreet.com* entitled "Galectin Pays Stock Promoters to Entice Retail Investors."[5]  The article set forth, in relevant part:

> Last Thursday, Emerging Growth issued a press release, picked up by the Yahoo! Finance feed, which misleadingly compared Galectin to Intercept Pharmaceuticals (ICPT).
>
> > From a clinical stage perspective, Intercept is leading the race, having delivered positive data from a Phase 2 trial of obeticholic acid (OCA) earlier this year. Shares tripled on the news. Galectin, a newly-coined member of the Russell 2000, is nipping at Intercept's heels and actually may be closer than what first appears with a Phase 1 trial because of the potential to treat fatty liver disease even once it has progressed. What distinguishes their approach from others that the timing of intervention with their proprietary carbohydrate polymer drug GR-MD-02 may be largely irrelevant to outcomes, with GRMD-02 seeming to work well even in advanced stages of liver fibrosis. This is especially important in fatty liver diseases because they are silent

---

[5] Article available at: http://www.thestreet.com/story/12823198/1/galectin-pays-stock-promoters-to-entice-retail-investors.html?puc=yahoo&cm_ven=YAHOO

- 18 -

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTY, GROSS MISMANAGEMENT, ABUSE OF CONTROL, UNJUST ENRICHMENT, AND VIOLATIONS OF SECTION 14(A) OF THE SECURITIES EXCHANGE ACT OF 1934

killers, often going undiagnosed for many years. The Galectin drug was granted FDA fast-track approval nearly a year ago.

*Only someone being paid to shill would claim Galectin is "nipping at Intercept's heels." Intercept is way ahead in developing a drug to treats non-alcoholic steatohepatitis (NASH), a severe form of fatty liver disease, and its clinical studies to date have been designed using appropriate endpoints.*

*Galectin, by comparison, is conducting a phase I "safety" study of its NASH candidate enrolling a tiny number of patients and using endpoints which collect useless biomarker data. It's as if Galectin doesn't really want to find out if their drug is effective against NASH.*

After Emerging Growth's misleading press release was issued Thursday, Galectin followed up with a press release of its own on Friday to announce a conference call for Tuesday morning. The subject of the call: To discuss updated results from its phase I NASH study. [Emphasis added.]

58.    On July 29, 2014, Defendants announced that the Company (under their direction and on their watch) had posted a new presentation on the Company's website regarding the results of the second cohort of patients in Galectin's Phase 1 clinical trial.  The results were described as "poor" by analysts.

59.    Later on July 29, 2014, Feuerstein published an article on *TheStreet.com* entitled "Galectin Drug is a Fatty Liver Flop."  The article set forth, in relevant part:

Fruit pectin is delicious spread on toast, but can an experimental drug derived from fruit pectin be effective as a treatment for fatty liver disease? Not so much, which explains the steep drop in Galectin Therapeutics(GALT) Tuesday.

*Galectin's experimental drug GR-MD-02 flopped in a phase I study of nonalcoholic steatohepatitis (NASH), a severe form of fatty liver disease. Across just about every biomarker for efficacy Galectin thought to measure, GR-MD-02 showed no difference from placebo.* Galectin deemed the updated results from the phase I study to be a success because patients treated with GR-MD-02 reported no serious side effects, but of course, ineffective placebos rarely raise safety concerns. [Emphasis added.]

60.    On this news, Galectin shares collapsed $8.84 per share, or *nearly 61%,* to close on July 29, 2014 at $5.70 per share.  Galectin shares have not recovered.

- 19 -

61.   On July 30, 2014, Defendants issued a press release entitled "Galectin Therapeutics Issues Statement on GR-MD-02 Development Program."[6]   Therein, Defendants *admitted* to hiring Emerging Growth in 2013, and admitted that Emerging Growth had written thirteen articles promoting Galectin stock.

62.   Throughout the Relevant Period, Defendants caused the Company to enter into and perpetrate a scheme with Emerging Growth/TDM whereby these promoters would disseminate positive but misleading reports about the Company.   Defendants never disclosed this scheme to shareholders, nor did they ever seek approval for such a scheme.   Moreover, Defendants failed to disclose that GR-MD-02 did not provide the benefits suggested by Defendants when discussing the patent the Company was awarded or the Phase 1 clinical trial Defendants were causing the Company to conduct.

63.   Accordingly, as a result of Defendants' breaches, the Company has been damaged.

## DERIVATIVE AND DEMAND ALLEGATIONS

64.   Plaintiff brings this action derivatively in the right and for the benefit of Galectin to redress the breaches of fiduciary duty and other violations of law by Defendants.

65.   Plaintiff will adequately and fairly represent the interests of Galectin and its shareholders in enforcing and prosecuting its rights.

66.   The Board currently consists of the following ten (10) directors: defendants Traber, Czirr, Martin, Amelio, Freeman, Greenberg, Mauldin, Prelack, Pressler and Rubin.   Plaintiff has not made any demand on the present Board to institute this action because such a demand would be a futile, wasteful and useless act, for the following reasons:

---

[6]*See* http://finance.yahoo.com/news/galectin-therapeutics-issues-statement-gr-130731968.html

- 20 -

a.  Defendants Traber, Czirr, Martin, Amelio, Freeman, Greenberg, Mauldin, Prelack, Pressler and Rubin (*i.e.* the entire Board) caused and/or allowed the Company to enter into the illicit and unethical agreement with Emerging Growth/TDM, whereby the Company's stock price would be artificially inflated through a series of misleading "articles" published by Emerging Growth. As set forth above, the Defendants have admitted to hiring Emerging Growth/TDM in June 2013, and have admitted that Emerging Growth published thirteen "articles" thereafter. As a result of this illicit scheme, defendants Traber, Czirr, Martin, Amelio, Freeman, Greenberg, Mauldin, Prelack, Pressler and Rubin (*i.e.* the entire Board) each face a substantial likelihood of liability for their breach of fiduciary duties, rendering any demand upon them futile. Moreover, this conduct is not entitled to the protections of the business judgment rule;

b.  Defendant Prelack illicitly sold and/or disposed of shares of Galectin stock while in possession of material, non-public adverse information, during a time in which Galectin stock was artificially inflated due to Defendants' illicit scheme. Defendants Czirr and Martin caused an entity which they controlled to sell shares of Galectin stock while Czirr and Martin were in possession of material, non-public adverse information, during a time in which Galectin stock was artificially inflated due to Defendants' illicit scheme. As such, defendants Prelack, Czirr and Martin violated the Company's insider trading policy, as set forth in the Code. As a result of these illicit sales, defendants Prelack, Czirr and Martin each received direct financial benefits not shared with Galectin shareholders, and are therefore each directly interested in a demand. Further, defendants Prelack, Czirr and Martin each are interested in a demand because they face a substantial likelihood of liability for their breaches of fiduciary duties of loyalty and good faith. Accordingly, demand upon Prelack, Czirr and Martin is therefore futile;

c.  The principal professional occupation of defendant Traber is his employment with Galectin as the President, CEO and Chief Medical Officer, pursuant to which he has received and continues to receive substantial monetary compensation and other benefits. In addition, according to the 2014 Proxy, Defendants have admitted that defendant Traber is not independent. Thus, defendant Traber lacks independence from demonstrably interested directors, rendering him incapable of impartially considering a demand to commence and vigorously prosecute this action;

d.  Defendant Czirr, a founder of the Company, is currently a Galectin employee, pursuant to which he has received and continues to receive substantial monetary compensation and other benefits. In addition, according to the 2014 Proxy, Defendants have admitted that defendant Czirr is not independent. Thus, defendant Czirr lacks independence from demonstrably interested directors, rendering him incapable of impartially considering a demand to commence and vigorously prosecute this action. In addition, defendant Czirr faces a substantial likelihood of liability for breach of fiduciary duties in connection with the sales of Galectin stock he caused the 10X Fund to execute, as set forth above;

- 21 -

e. Defendants Traber, Czirr, Martin, Amelio, Freeman, Greenberg, Mauldin, Prelack, Pressler and Rubin (*i.e.* the entire Board) signed the false and misleading 2013 10-K. The 2013 10-K was false and misleading because (among other things) it utterly failed to disclose the scheme that Defendants had entered into with Emerging Growth/TDM, and misstated the benefits and effectiveness of GR-MD-02. As a result, defendants Traber, Czirr, Martin, Amelio, Freeman, Greenberg, Mauldin, Prelack, Pressler and Rubin (*i.e.* the entire Board) each face a substantial likelihood of liability for their breach of fiduciary duties, rendering any demand upon them futile;

f. During the Relevant Period, defendants Prelack, Freeman and Greenberg served as members of the Audit Committee. Pursuant to the Company's Audit Committee Charter, the members of the Audit Committee were and are responsible for, *inter alia*, reviewing the Company's annual and quarterly financial reports and reviewing the integrity of the Company's internal controls. Defendants Prelack, Freeman and Greenberg breached their fiduciary duties of due care, loyalty, and good faith, because the Audit Committee, *inter alia*, allowed or permitted the Company to disseminate false and misleading statements in the Company's SEC filings and other disclosures and caused the above-discussed internal control failures. Therefore, defendants Prelack, Freeman and Greenberg each face a substantial likelihood of liability for their breach of fiduciary duties and any demand upon them is futile; and

g. Defendants Traber, Amelio, Freeman, Greenberg, Mauldin, Prelack, Pressler and Rubin (a majority of the Board) are incapable of independently and disinterestedly considering a demand to commence and vigorously prosecute this action since, in addition to their participation or approval in the wrongs alleged herein, each of these defendants are controlled by defendants Czirr and Martin. In 2009, defendants Czirr and Martin led a takeover of the Company. Defendants Czirr and Martin are also co-founders of the 10X Fund. As of March 19, 2014, 10X Fund – which is controlled by defendants Martin and Czirr -- is the owner of all of the issued and outstanding shares of Galectin Series B preferred stock. As holders of Galectin Series B preferred stock, 10X Fund has the right to, among other things, vote as a separate class to nominate and elect two directors, referred to as the Series B directors, and to nominate three directors, referred to as the Series B nominees, who must be recommended for election by holders of all of Galectin's securities entitled to vote on election of directors. Further, defendant Czirr is the Series B director. In addition to controlling all of the issued and outstanding shares of the Series B preferred stock, Czirr, Martin and the 10X Fund, collectively, own a significant amount of the Company's common stock. Defendants Czirr and Martin serve as Executive Chairman and Vice Chairman of the Board, respectively. Due to their significant business ties with one another, Czirr and Martin are beholden to one another. Moreover, because of the influence each has as a result of their positions on the Board and ownership of all of the Series B preferred stock and significant

- 22 -

holdings of the Company's common stock, defendants Traber, Amelio, Freeman, Greenberg, Mauldin, Prelack, Pressler and Rubin (a majority of the Board) are beholden to defendants Czirr and Martin, and are therefore incapable of impartially considering a demand to commence and vigorously prosecute this action against defendants Czirr and Martin. Thus, demand is futile as to defendants Traber, Amelio, Freeman, Greenberg, Mauldin, Prelack, Pressler and Rubin.

## FIRST CAUSE OF ACTION

### AGAINST ALL DEFENDANTS FOR BREACH OF FIDUCIARY DUTY FOR DISSEMINATING FALSE AND MISLEADING INFORMATION

67. Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

68. As alleged in detail herein, each of the Defendants (and particularly the Audit Committee Defendants) had a duty to ensure that Galectin disseminated accurate, truthful and complete information to its shareholders.

69. Defendants violated their fiduciary duties of care, loyalty, and good faith by causing or allowing the Company to disseminate to Galectin shareholders materially misleading and inaccurate information through, *inter alia*, SEC filings and other public statements and disclosures as detailed herein. These actions could not have been a good faith exercise of prudent business judgment.

70. As a direct and proximate result of Defendants' foregoing breaches of fiduciary duties, the Company has suffered significant damages, as alleged herein.

## SECOND CAUSE OF ACTION

### AGAINST ALL DEFENDANTS FOR BREACH OF FIDUCIARY DUTIES FOR FAILING TO MAINTAIN INTERNAL CONTROLS

71. Plaintiff incorporates by reference all preceding and subsequent paragraphs as if fully set forth herein.

- 23 -

72.     As alleged herein, each of the Defendants had a fiduciary duty to, among other things, exercise good faith to ensure that the Company's financial statements were prepared in accordance with GAAP, and, when put on notice of problems with the Company's business practices and operations, exercise good faith in taking appropriate action to correct the misconduct and prevent its recurrence.

73.     Defendants willfully ignored the obvious and pervasive problems with Galectin's internal controls practices and procedures and failed to make a good faith effort to correct the problems or prevent their recurrence.

74.     As a direct and proximate result of the Defendants' foregoing breaches of fiduciary duties, the Company has sustained damages.

**THIRD CAUSE OF ACTION**

**AGAINST THE INSIDER SELLING DEFENDANTS FOR BREACH OF FIDUCIARY DUTIES FOR INSIDER SELLING AND MISAPPROPRIATION OF INFORMATION**

75.     Plaintiff incorporates by reference all preceding and subsequent paragraphs as if fully set forth herein.

76.     At the time of the stock sales set forth herein, the Insider Selling Defendants were in possession of material, adverse, non-public information described above, and sold Galectin common stock on the basis of such information.

77.     The information described above was proprietary, non-public information concerning the Company's financial condition and future business prospects.  It was a proprietary asset belonging to the Company that the Insider Selling Defendants used for their own benefit or for the benefit of an entity they controlled when they sold Galectin common stock.

78.     At the time of their stock sales, the Insider Selling Defendants knew that Defendants had secretly hired Emerging Growth/TDM to disseminate positive but misleading reports about the

- 24 -

Company, and knew that GR-MD-02 did not provide the benefits suggested by the Defendants when discussing the patent the Company was awarded or the Phase 1 clinical trial the Defendants were causing the Company to conduct.

79.     Since the use of the Company's proprietary information for their own gain constitutes a breach of the Insider Selling Defendants' fiduciary duties, the Company is entitled to the imposition of a constructive trust on any profits the Insider Selling Defendants obtained thereby. Plaintiffs, on behalf of Galectin, have no adequate remedy at law.

### FOURTH CAUSE OF ACTION

### AGAINST ALL DEFENDANTS FOR UNJUST ENRICHMENT

80.     Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

81.     By their wrongful acts and omissions, the Defendants were unjustly enriched at the expense of and to the detriment of Galectin.

82.     Plaintiff, as a shareholder and representative of Galectin, seeks restitution from these Defendants, and each of them, and seeks an order of this Court disgorging all profits, benefits and other compensation obtained by these Defendants, and each of them, from their wrongful conduct and fiduciary breaches.

### FIFTH CAUSE OF ACTION

### AGAINST ALL DEFENDANTS FOR ABUSE OF CONTROL

83.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

84.     Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence Galectin, for which they are legally responsible.  In particular, Defendants abused

- 25 -

their positions of authority by causing or allowing Galectin to misrepresent material facts regarding its financial position and business prospects.

85.     As a direct and proximate result of Defendants' abuse of control, Galectin has sustained significant damages.

86.     As a result of the misconduct alleged herein, Defendants are liable to the Company.

87.     Plaintiff, on behalf of Galectin, has no adequate remedy at law.

## SIXTH CAUSE OF ACTION

## AGAINST ALL DEFENDANTS FOR GROSS MISMANAGEMENT

88.     Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

89.     Defendants had a duty to Galectin and its shareholders to prudently supervise, manage and control the operations, business and internal financial accounting and disclosure controls of Galectin.

90.     Defendants, by their actions and by engaging in the wrongdoing described herein, abandoned and abdicated their responsibilities and duties with regard to prudently managing the businesses of Galectin in a manner consistent with the duties imposed upon them by law.  By committing the misconduct alleged herein, Defendants breached their duties of due care, diligence and candor in the management and administration of Galectin's affairs and in the use and preservation of Galectin's assets.

91.     During the course of the discharge of their duties, Defendants knew or recklessly disregarded the unreasonable risks and losses associated with their misconduct, yet Defendants caused Galectin to engage in the scheme complained of herein which they knew had an unreasonable risk of damage to Galectin, thus breaching their duties to the Company.  As a result,

- 26 -

Defendants grossly mismanaged Galectin.

## SEVENTH CAUSE OF ACTION

### AGAINST THE DEFENDANTS FOR VIOLATIONS OF SECTION 14(A) OF THE SECURITIES EXCHANGE ACT OF 1934

92.     Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

93.     Rule 14a-9, promulgated pursuant to §14(a) of the Securities Exchange Act of 1934, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. §240.14a-9.  Specifically, the 2014 Proxy violated §14(a) and Rule 14a-9 because it utterly failed to disclose that Defendants had caused the Company to enter into a scheme with Emerging Growth/TDM, whereby these promoters would disseminate positive but misleading reports about the Company.

94.     In the exercise of reasonable care, Defendants should have known that by failing to disclose this material fact, the statements contained in the Proxy were materially false and misleading.  The misrepresentations and omissions in the Proxy were material to plaintiffs in voting on the Proxy.

95.     The Company was damaged as a result of the Defendants' material misrepresentations and omissions in the Proxy.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment as follows:

A.     Against all Defendants and in favor of the Company for the amount of damages sustained by the Company as a result of Defendants' breaches of fiduciary duties;

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTY, GROSS MISMANAGEMENT, ABUSE OF CONTROL, UNJUST ENRICHMENT, AND VIOLATIONS OF SECTION 14(A) OF THE SECURITIES EXCHANGE ACT OF 1934

B.      Directing Galectin to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect the Company and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote resolutions for amendments to the Company's By-Laws or Articles of Incorporation and taking such other action as may be necessary to place before shareholders for a vote a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board

C.      Awarding to Galectin restitution from Defendants, and each of them, and ordering disgorgement of all profits, benefits and other compensation obtained by the Defendants;

D.      Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

E.      Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

Dated: August 25, 2014                **ALDRICH LAW FIRM, LTD.**

JOHN P. ALDRICH (NV Bar No. 6877)
1601 S. Rainbow Blvd., Suite 160
Las Vegas, Nevada 89146
Telephone: (702) 853-5490
Facsimile: (702) 227-1975
jaldrich@johnaldrichlawfirm.com

THE WEISER LAW FIRM, P.C.
ROBERT B. WEISER
BRETT D. STECKER
JEFFREY J. CIARLANTO
22 Cassatt Avenue, First Floor

- 28 -

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTY, GROSS MISMANAGEMENT, ABUSE OF CONTROL, UNJUST ENRICHMENT, AND VIOLATIONS OF SECTION 14(A) OF THE SECURITIES EXCHANGE ACT OF 1934

Berwyn, PA 19312
Telephone: (610) 225-2677
Facsimile: (610) 408-8062
rw@weiserlawfirm.com
bds@weiserlawfirm.com
jjc@weiserlawfirm.com

THE WEISER LAW FIRM, P.C.
KATHLEEN A. HERKENHOFF
12707 High Bluff Drive, Suite 200
San Diego, CA 92130
Telephone:  (858) 794-1441
Facsimile:  (858) 794-1450
kah@weiserlawfirm.com

*Counsel for Plaintiff*

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTY, GROSS
MISMANAGEMENT, ABUSE OF CONTROL, UNJUST ENRICHMENT, AND VIOLATIONS OF SECTION 14(A)
OF THE SECURITIES EXCHANGE ACT OF 1934

## VERIFICATION

I, Sui Yip, under penalty of perjury, state as follows:

I am the Plaintiff in the above-captioned action.  I have read the foregoing Complaint and authorized its filing.  Based upon the investigation of my counsel, the allegations in the Complaint are true to the best of my knowledge, information and belief.


DATED: __8/6/14__                              _____
                                               Sui Yip